First case on our docket today is Malec v. City of Belleville And we have Mr. John Myers for the appellant And we have Robert Sprague and Bradley Winters for the appellate You may proceed when you're ready Mr. Myers May it please the court and counsel, I'm John Myers, I'm the attorney for Appellant Steve Malec who's in the gallery there This case involves the legality of a TIF district, it's a TIF agreement, business district and economic incentive agreement in St. Clair County, the city of Belleville Basically we contend, we contended in the trial court, we contend here that the TIF was irregularly formed, the tax imposed under the business district act was improper due to the lack of lighting conditions And finally that there were some irregularities with the findings of the city council with respect to the economic incentive agreement, the sales tax agreement were incorrect Now there's a welfare of facts in this case, as you know we had a five day trial, the transcript is huge, the record is huge But a number of the issues before this court are purely legal issues that really don't depend on any interpretation of the testimony One of these issues that I want to talk about this morning is the meaning of the words consist of an unused mine in the TIF act This TIF was put together on the assumption that an abandoned coal mine 100 feet underneath the surface of land is an unused mine And that the land in question consists of an unused mine as those terms are present in the TIF act The reason those provisions are important are because it's uncontested that this was agricultural land And if it's agricultural land it can only qualify for TIF treatment if certain conditions were met And one of the conditions that had to be met here was that the land consists of an unused mine So is that defined? It is not defined, your honor Neither in the statute nor by case law That's correct, this is a case of first impression on that point Our contention is that, and by the way the word consist, near as I can find, and I think Mr. Winters wouldn't disagree with me Even the word consist of is not defined in Illinois law We relied on a definition contained in Black's Law Dictionary And we contend that the word consist of can't apply to a mine 100 feet below the surface Where for at least 50 years a farmer has been farming the land We contend that the dominant feature of this property is the working farm on the surface And we also contend that in the context of the TIF Act, the TIF Act only talks about surface features being blighting factors And in the clause that's referred to that we're talking about here, unused mine, strip mine, pond, or quarry We contend, and the evidence shows, those also are surface features, not mines Are you contending that the only blighting that can be done because of a mine is as a result of a strip mine and not a mine that's underground? Yes sir, that's exactly right We're contending that this is a surface feature And the TIF Act talks about surface features Excuse me, and the word consist of does not mean include It means that that is the predominant feature of the land And here the predominant feature of the land was this working farm But again, that is Has it always been a working farm? Is it a working farm today? Well right now it's a Walmart and Lowe's But prior to this designation as a TIF it had been a working farm for 50 years And that's all in the record of the testimony of Mr. O'Connor So when it was declared a TIF it was a working farm at that time? Yes sir And corn, soybeans, grain, what was it? Exactly, corn and soybeans Is there any evidence in the record to show that it didn't produce the average number of bushels like acreage does in other parts of the state or the county? To the contrary your honor, the farmer testified that it had been profitable all those years I didn't do a comparison of yield between that and some other farmers But that's not an issue, that it only produced a third of the normal bushels that otherwise And therefore it's blighted because of that reason Well that's another case I guess that you might get some of it, but that's not this case your honor Are you saying then that if this court opposed the TIF district that it would in effect be stating that a working farm would be blighted by definition? Well you would be saying that this working farm is blighted by definition That a working farm that happens to have a combine underneath it is blighted by definition Yes, that's what you would be saying By the way the testimony from the farmer was that there had never been any subsidence events on this land during the 50 years that he and his family had farmed The second issue again is an issue of law And it's the issue of what does the TIF Act mean when it says unused mine? There was testimony on that, but basically this type of mine that has been sealed and abandoned a number of years ago There's a legal term of art for such a mine, and it's contained in the Mine Act The legal term of art is abandoned mine This is a mine that can never ever be reopened because of the methane and all the other stuff that's down there Well maybe 20 generations hence they might figure out a way to do it, but for now it's permanently sealed and abandoned under the Mining Act Let me ask you one other question, that's the blighting part of it Do you all concede, or does the plaintiff concede that there was approximately 4 acres that was blighted? Yes sir And what was the basis of the blight on those 4 acres? That was the old farmstead, it had the silo, it had some farm buildings and what not And they had basically fallen apart because the farmer who testified, he just farmed and didn't live there Were there crops growing on that? No sir, it was like I said, abandoned, old beat up outbuildings, a silo But that was a minor, minor part of the entire property, the evidence was quite clear on that And there were still buildings on there right? Yes sir, and we do concede that that little, well the evidence was either 2.5 or 4 acres that went back and forth Had those buildings been removed and then you'd grow corn or beans on it? I assume that's right Then it would no longer be blighted then? I think that's right, I don't disagree with that, but our point is that's just a little piece of this 150 acre parcel Mr. Myers, so there's no point of legal reference for what an unused mine is? Yes, again it's an undefined term in the TIF Act And why is it that it could not include an abandoned mine? Well, our contention is that when the legislature has defined a term, abandoned mine, that perfectly fits this mine If the legislature intended to include abandoned mines in its laundry list of blighting factors, it would have said abandoned mine, not unused mine Could not the term unused mine include abandoned mine and be a broader definition? We don't think so The testimony from the professor of yard work is that this mine is not an unused mine, using mining terminology It's an abandoned mine Another major issue in this case goes back to the Wood River case And it has to do with whether, for purposes of the Business District Act, a working farm can be blighted Now the Business District Act, as you know, if you want to impose the additional sales tax within the business district, there has to be a finding of blight The definition of blight in the Business District Act more or less encompasses the definition in the TIF Act, but it goes beyond that And it says that the blight has to constitute a social or economic liability in its present condition and use And under the Wood River case, there, I mean, that case was so similar to this one, we contend that it's controlled That you're looking at 80 acres in the case of the business district, and again, you've got the 4 acres of falling down buildings The rest of it's a productive working farm The farmer, again, testified that there's no impediment at all to his farming caused by any conditions on that 80 acres And I think this court drew the distinction in the Wood River case between saying that property is blighted with respect to some contemplated future use Such as a shopping center, and saying that the property is blighted with respect to its current use, that of a farm And again, we contend that, you know, the facts, what's out there isn't disputed We contend that under those facts, you can't say that this property is a menace to society or its social or economic liability in its present condition and use We contend that this case is controlled by the Geisler case I have another question about this The trial court found that the property was part of a larger tract that had been subdivided into more than 3 smaller tracts Yes Do you agree that that finding was correct? I do not You do not So it was not subdivided into 3 smaller tracts? Well, the subdivision has to occur between 1950 and 1990 Okay Under the TIF Act And there are, you know, we have an opinion from Bond Council, which happens to be the same law firm that represented the city Excuse me, represented the developer And they said, hey, this is problematic We don't think we've met the test And they went on to say, if you want to subdivide the property and qualify it for TIF treatment We're now out of the Business District Act and back into TIF They said, what you've got to do is subdivide it before you pass your TIF ordinances And again, the evidence is clear that that didn't happen They qualified it under the TIF Act and then they subdivided it The parcels, 2 of the parcels in this land, Your Honor We developed it in the brief They've had the same tax ID number since 1937 So they're outside the 1950 to 1990 window Which I am told, I don't know if this is true Some of these guys that do TIF law, they tell me that had to do something with the building of the interstates It's an odd, certainly odd, 1950 to 1990 It had to do with lands being split in two by the interstates In case you're wondering where that came from, that's the rumor I heard Lastly, there's an issue of law as to what it means for land to be vacant Land under Section 811.20 of the Illinois Municipal Code The Economic Incentive Agreement, which is also known as sales tax Sharing agreement provisions in the Municipal Code The definition of vacant in the TIF Act, as we're all painfully aware, is convoluted And it has to do with things like subdividing and whether it's a quarry and all that sort of thing There is no corresponding convoluted definition in Section 811.20 of the Municipal Code Under 811.20, any municipality can agree to share any amount of sales tax with any developer within a defined area If some rather permissive standards are met But one of the standards, one of the findings made by the City Council qualifying this area for a sales tax agreement Was that the land was vacant And we contend, and again this is another issue of first impression We contend that the meaning of the word vacant in the economic incentive provisions of the Municipal Code Is the common definition Nothing going on And we've cited a couple of cases that talk about the fact that growing crops If you have growing crops, you don't have vacant land So commercial farmland can never be vacant? Well, I guess it could if you let it go to weeds But as long as crops are growing on it, Your Honor We contend it's not vacant As that term is used in the economic incentive provisions of the Municipal Code It might be vacant under the TIF Act with that other convoluted definition But it's certainly not vacant under Section 811.20 And the case law is limited once again But the case law strongly suggests that when you have growing crops on land, it's not vacant It's something else, but what that something is, is not vacant By the way, there's also some provisions in the tax code That we've cited that relate to vacancy in the context of crop land Lastly, I would like to talk about one issue I guess you might say there was a factual dispute And that was whether this land met the But-For test Now, of course, Judge Guido ruled against me on that But there, I think he was against the manifesto of the evidence Because if one thing was proved in this case It's that Belleville is undermined And we put in the appendix to our brief a number of maps Showing the extent of undermining in St. Clair, Madison County Showing the existence of Walmarts, Lowe's, all other kinds of commercial development Atop these abandoned mines And also, one of the exhibits that the defendants brought to the table Was a mining report from the U.S. government That showed how, in my hometown, Springfield A Walmart plopped a building right down on top of a mine Where there had been observed subsidence events The overwhelming evidence shows that underground mines Are no impediment to development in St. Clair County And we contend that the findings of the trial court Adverse to us on that were against the manifesto of the evidence But didn't some of those commercial entities require something to protect them? Walmart, Costco, I thought I remember something That they said they would never build on that property Because it was undermined Well, I think that's the defense's contention But I don't think it was borne out by the evidence That's not the record No, it's not What was in the record was that the developer offered this site to Walmart And Lowe's said, by the way, we're more than happy to use public money To fill in this mine with what amounts to plaster of Paris And if you're Lowe's or Walmart were going to say no You're not going to say that, you're going to say fine, proceed But there was not evidence that this was absolutely required As a condition of development Even though, of course, it was provided for in the development contract Was that gouting done in other places in St. Clair County? No, well, yes, the evidence showed it in a couple places But the real interesting thing, your honor Is that 80 acres of this parcel was devoted to 347 homes And that area was not grouted It's just beyond dispute that you don't need to grout Even if you accept the proposition that you need to grout For commercial development over an unused mine It's beyond dispute that you don't need to grout Where there's residential development over an unused mine And here, 80 acres of this 150 acres was developed residentially With no grouting How long had it not been, well, let me rephrase that Didn't your own expert state that Costco would not build there Unless there was remediation or grouting? Yeah, that's what he said And he said the reason for that was Had to do with the fact that Costco was self-insured I don't know, are lights not working here? It was working this morning That's unfortunate That's fine, I'm fine I should have checked my watch You'll have the opportunity to read that, Mr. Myers Thank you Mr. Winters, you may proceed when you're ready to Is it working now? For a while Pleased to report, Councilman Brad Winters Along with Councilman Warrenstein and Bob Sprague Here for the appellants in this case There's one important fact, undisputed A fact of physics that bears on many of the issues in this case And several questions of importance pose And that's this That when an area is undermined As this one was by a substantial, in this case a thousand acre Underground mine When the mine itself collapses And it will at some point And this one had a moderate risk On a scale of up to Starting with light, moving up to moderate It was a high end of moderate But when that shaft collapses Of the surface, a hundred feet or so above The difference may only be six inches, seven inches Or in one case in Swansea, the value city It dropped 18 inches, the store dropped 18 inches over 24 hours But the fact is that once that happens Once the actual mine collapses And that reaches the surface That thereafter, and all the witnesses talked about this That the feathering, if you will Or the loosening of the soil above the mine Will recompact over time And that subsidence will continue And you can't fix it at that point Grouting the mine is what keeps it from falling in the first place And it is a fix Once it happens, it's virtually impossible to stop And it has a serious effect We know in this case that one of the witnesses This was put on by a then plaintiff, now appellate The farmer, Carol Donnell Said that this land, an issue in this case Sold for $50,000 per acre There was no eminent domain involved here Land that he owned approximately a mile I believe maybe a mile to two miles away Where subsidence had begun Sold for a third of that for $12,000 That once that subsidence begins The potential, the very real potential For almost certain continued subsidence exists And the threat is for adjacent property as well Caused by what was referred to as an angle of inclusion Where property close to a subsidence event Can actually join in and then fall as well And that's an important fact here On several issues The property value effect As well as the effect on neighbors to the property If there is subsidence here The court, and I believe it was you, Judge Comer Mentioned earlier this concern about the farm And the percentage of the land that was actually Involved in the farm's stead And under the TIF Act First and foremost, of course, our legislature Set out a test to determine When farmland may be lightened And if it is vacant land As this was under the statutory test There's a blight test that is to be applied And this property satisfied that blight test As the city found and as the court agreed And the way it did Was because it consisted of an underground mine  And those three words, consist, underground, and mine Are the grovel of the plaintiff's complaint About the blighting analysis The fact is that consist means consist And though this hasn't been determined yet by any case law The statutory language itself Makes it very clear that if a mine is present And it is present With that presence documented To a meaningful extent on this property The property consists of a mine And the language is very clear In the same way, your honor, that air consists Of nitrogen and oxygen and helium And argon and other materials The language is very clear And I will follow because it's short If the land is blighted, if the sound growth As determined by the community Of the redevelopment project area is impaired It doesn't have to be destroyed Or rendered impossible Did your June 4, 2004 letter From Midwest to the developer State that? State that the unused mine impairs The sound growth of substantially all the area? I couldn't find that in the letter Yeah, I don't recall that particular conclusion Was in there other than the facts that were actually there In fact, the Midwest testing, recall your honors The geotech and the actual determination Of the effect of some of these Of the geotechnical issues, the geotechnical structures Were laid out by Mr. Norber Who was involved in Geisler Although he was not the Mr. White who created the problems That the court observed in the Geisler case But it was Mr. Norber who offered opinions To the city in terms of the effect Now, did he work for Midwest? No, sir This is kind of after the fact The Midwest letter of June 4 didn't really point out Any impairment There was a preliminary report, yes your honor But there was also a more elaborate Mine subsidence study that was performed Where borings were dropped into the mine I'm sorry, borings were made and cameras were put down Into the voids, and by the way Eight borings reached voids Every void had material from the roof of the coal mine Observed on the floor, and that was part of the reason Why this was determined to offer a moderate risk of subsidence But in terms of the consist issue The blight test under TIF The mine must This mine factor, this single factor Must exist to a meaningful extent So that a municipality may reasonably find That it is clearly present and reasonably distributed Now, and that factor is The area consists of one or more unused borings, mines or strip mines You can't say that it must consist of Only a mine to satisfy this requirement If the statute specifically says It must be reasonably distributed It must be clearly present to a meaningful extent Because it can't be present to a meaningful extent Or reasonably distributed on the one hand If the statute also requires it and it's the only feature there Consist means consist This property does consist And I believe that 108 in our appendix There's a map showing that the vast majority Of this property and adjacent properties are undermined by this mine I have a question dealing with the issue of Vacants Under TIF, commercial farmland that has been Subdivided can be vacant No doubt They contend that the subdivision was not done between 1950 and 1990 Do you agree with that? No, they're wrong Well, the subdivisions occurred And I believe there were actually 4 or 5 And of course it only takes 2 for them to be divided into 3 pieces I believe there were 4 or 5 documented They're documented in the record, they're in our appendix That occurred between 1950 and 1990 and were filed The subdivision that was What about Mr. Meyer's statement that Two of the properties had the same tax ID I don't know the significance of that Your Honor, under the statute, which could not be clear It says if they were subdivided and it was recorded between 1950 and 1990 into 3 or more parcels A larger tract That that satisfies the statute I think what he's suggesting is that it somehow got unsubdivided The statute is clear, it says it has to happen The subdivision that we're talking about Has to do with events after we were developing After the development process began But the TIF statute is very clear in its temporal sense And in what must happen, and it happened The city found it, Judge Quito agreed And the materials are in our brief And every one of them, a stipulated exhibit By the way, Your Honor, are in our appendix Your Honor asked about the unused Nature of this mine It hasn't been used in 40 years It's been sealed in 40 years Mr. Meyer suggests to you that this unused mine Is not, as the statute uses the term, an unused mine It is. An abandoned mine is an unused mine Someone has gone through the legal steps Of formally declaring abandon, sealing it And having the state certify it But to have otherwise would allow someone who just walked away from the mine And left it as a mess, or left it open and didn't properly abandon it That that mine wouldn't be available That the landowner could not avail him or itself Of the statute Because someone had failed to do the right thing at some point in the past The statute uses the word unused So it's in a broader sense Absolutely, Your Honor Finally, Mr. Myers and Mr. Malik told the trial court That mine does not mean mine That it only means an above ground mine And I suggest to you, Your Honor, that that is 180 degrees wrong That unused mine in the statute Only means underground mine First, it's of course inconceivable that the legislature Would have used the word mine And not intended for it to include 95% of the mines in the state But more importantly A strip mine, the universe of mines is divided I guess at ground level to above ground, below ground There's mines and a common part of strips And a strip mine could be literally A hill of, let's say, coal That is stripped away to a point where it is literally Flat as a golf course Now, that's an unused strip mine at some point And by Mr. Myers' proposed reading of the statute That land that doesn't require Or of course deserve the TIF assistance It certainly doesn't need it Why that mine would be entitled to TIF assistance Whereas an underground mine that presents this insidious risk Of potentially devastating property And property values and structures on the property Well, that one is not what the state suggested And that's clearly wrong The above ground mine that is contemplated by the statute Is talked about separately That's a strip mine pond That's a strip mine where the land has been stripped away To a point where it's encroached upon the water table And that makes sense again Because a municipality If they're going to get someone to develop that May require substantial work To seal off that water table incursion There is a but-for test as well And Mr. Myers told the court That there was nothing in the record Concerning the potential uses of this property Or the Lowe's or Walmart's refusal To develop on this property There was testimony, there are documents It's mentioned in our brief But the fact of the matter is this That this was a desirable pond And a corridor that should have been developed That no one had ever developed Not in the history as far as we know And certainly not since it was annexed in 1994 Not a nibble according to the witnesses That were presented to the court No building permanents were pulled Now the other three corners of this intersection Which are not undermined by the way Church, convenience store, and school This intersection, on this quadrant Of that intersection, nothing ever And the reason was, among others And the threat that it posed Mr. Myers talked to you about the residential property This residential property could not have happened And that was the testimony without this project Mr. Stricker gave testimony on this fact And he did say why Well I guess for the right price it could have been developed But that right price he suggested Would be as low as a dollar In reality, in real life, it wasn't going to develop And he said that this project That is the TIF, BDA, EIA funded project Is what made this residential development Is there anything in the record to show what the cost Of all this grouting is going to be? Well the cost is sunk, it has been spent By the way, the cost has been sunk, it has already been spent I don't recall the actual number for the grouting But for the court's information None of the money that will be Hopefully returned to the developers To reimburse them for the forward funding Of $23 million in municipal improvements None of that goes to Wal-Mart, it goes to the developer For the developer's improvement of Carlisle and Greenmount  Of Carlisle and Greenmount For the bringing of utilities to this site Utilities that have been promised by the City of Belleville To Shiloh when the land was annexed in 1994 And most importantly, for regional stormwater detention Which was a killer here And in fact, Mr. Stricker said That if we, that is the commercial developer Had not taken the stormwater detention That he was required to put on the residential piece Onto our piece, we took his stormwater detention land Which was several acres, this project would not have worked The residential wasn't going to happen Without the TIF, the BDA and the EIA Nothing had happened in 30 years On this property It hadn't developed and the city was well within its discretion And certainly didn't abuse it by finding That it wasn't going to without this And yes, your honor, during my examination Of their expert, Mr. Johnson Who had been led to believe, and the record is clear on this That this mine only posed a slight risk I showed him the 2005 Mine subsidence study I said, it says moderate risk, did you know that? And he said, no, I did not know that Well, knowing that, what do you know now? As a Costco consultant, what would you tell Costco In terms of building over a mine with a moderate risk And he said, I would tell them Or I would tell him to walk Not because of any insurance issues Not because of Costco's risk aversion Because when he was originally testifying He was okay with Costco building over a mine with a slight risk But once he saw moderate, in fact to the high end of moderate He said, Costco, I would have told them to walk So, what do we know about this site? We know that every commercial developer that's ever looked at it Lowe's, Walmart, Costco Through that hypothetical question And in reality, everybody else, because no one else has ever built there At least by inference, had rejected that site And sound growth is the test That's the test, is the sound growth impaired And this corner had always been In every iteration of the city's master plan and planning documents Commercial And the things that made it good for commercial made it bad for residential The fact is that all the other three were, as I said A church, a convenience store, a school It's a busy intersection, I guess a noisy intersection With the community college But the things that made it good visibility wise Access wise for commercial made it bad for residential And the city's concept of sound growth, not for us But has always been commercial at that intersection And the court was talking also earlier Under the business district act May I ask you a question? Under the business district act Mr. Myers would like this case to be Geisler It is not Geisler In Geisler, Judge Fulmer's opinion There's a couple of paragraphs that deal with issues here And at least to the reader I would presume what the court intended It says that the statute means what it says And that was the problem that Wood River had They didn't read the statute to mean what it said They didn't evaluate land in its current condition and use They evaluated it, Mr. White, the consultant They evaluated it for future development For what might happen in the future Didn't use the statutory criteria, use shoddy methods And didn't look at it in its current condition and use And that's the critical difference in this case On the business district act analysis Is that preposition In its current condition and use is what the statute says Mr. Myers and Mr. Malik, the appellants Would like you to read that as for its current condition and use These aren't problems for row crop farming The dilapidated housing, the kids using these places The mine The dumping that was going on there The sub code, non-utility buildings The failing intersection Every road in this business district had failed But Mr. Myers says But that's irrelevant for row crop farming But the statute says in its current condition and use And here's why that's significant If 20 acres of this farm had been set aside for a composting Where the farmer had collected valuable organic remnants Maybe he had livestock somewhere else Brought over waste and was building compost To use on his farm, which may have had great value to the farm But was generating smell And was an eyesore and health challenges That property would be subject to an analysis Here for blight I'm sorry, for blight under the business district act Because in its current condition and use As the user was using it The condition as the user or the good lord Had presented it in In its current condition and use It had features that satisfied the blight analysis It doesn't matter For row crop farming And if you look at the BDA The business district act test Most of them deal with the public How does this affect the public at large Not the row crop farming activities Is it a threat to the public safety Is it a threat to the public health A threat to the public welfare and morals And this mine, which undermines the vast majority of this property Alone satisfies this Because it presents an immediate risk To the property itself, the values could be devastated It presents an immediate risk to the land To the adjacent roadways To adjacent property owners And that doesn't even begin to deal with The substandard subcode construction Or buildings, the lack of utilities In current condition and use Let me ask you a real quick question Geisler, I may agree, is distinguishable I think the language that Schumer used Was hypothetical future commercial use And isn't this hypothetical future commercial use As we point out in our brief, your honor, absolutely not And Mr. Norbert pains to say In its current condition and use The Greenmount-Carlisle intersection was an F, failing And carbon The only traffic consultant in the case Says that has safety implications So every roadway was failing In current condition and use there was dumping In current condition and use there was criminal activity And kids using these abandoned properties In their current condition and use, these buildings all failed to meet code In its current condition, that mine was the threat To the property, to the roadways, to the utilities To the adjacent property Thank you Mr. Winters for your argument Mr. Myers, you have the opportunity to rebut I think I just want to rebut One point Mr. Winters tells us that This mine was a threat to the public health Safety and welfare If that's true, then how come There are now 347 residences Erected right over top of this mine This shows the The city says on the one hand It's a terrible thing, this mine And on the other, we're going to put all these people And their homes on top But they can't have it both ways The other thing about this traffic Study And the record's clear on this That this level of service F Is a term used by traffic engineers It has nothing to do with safety It doesn't mean that the intersection's unsafe All it means is that You've got to wait five minutes During the worst traffic of the year To turn right It has to do with the queuing of the cars It has nothing to do with safety I just wanted to rebut those two points Thank you, Mr. Myers Thank you, Mr. Winters and Mr. Sprague For your briefs and arguments And we'll take the matter under advisement